## VEEDER vs. THE TOWN OF LIMA.

The supervisors of a town were authorized by law to subscribe for capital stock of a plank road company and issue bonds of the town therefor; but the question was first to be submitted to the electors of the town upon the written application of ten or more electors, by the supervisors posting up, ten days beforehand, in at least five public places of the town, notices of an election for that purpose; and said election was to be conducted in all respects as town meetings are required to be conducted, and if it appeared that a majority of the votes given were in favor of such subscription, the same was to be made in the manner provided for in the act, but not otherwise. It was further provided that the supervisors, or one of them, should make an affidavit of the posting of said notices, which, with said application, should be *deposited* and *recorded* in the office of the town clerk of said town, and the same, or certified copies of them, or of the record of them, should be received in all courts of this state as conclusive evidence of the facts set forth therein. In an action upon a bond alleged to have been executed by the town in pursuance of this act: *Held,* that the absence of any record in the office of the clerk of said town, of any affidavit of notice as required by the act, was sufficient to put purchasers of such bonds on inquiry; and it appearing that no such affidavit had ever been made, and that notice was not in fact given as required by the act, and that an election was not held and certified in the manner prescribed, and it not appearing that the town had done any subsequent act amounting to a ratification of the issue of the bonds, or estopping it from denying their validity, the plaintiff could not recover, although the bond itself recited that in pursuance of said act the legal voters of the town had authorized the supervisors to subscribe for stock of said company, &c.

If there had been a valid election and no record made, or if the record had been lost or destroyed, the town might have been bound; but the burden of proving the facts would be upon the holders of the bonds.

COLE, J., dissents.

APPEAL from the Circuit Court for *Calumet* County.

Chap. 160, Private and Local Laws of 1854, contains the following provisions:

"Sec. 1. That the supervisors of any town through which the Taycheedah and Green Bay plank road may be located, or has been already located, by and with the consent of a majority of the legal voters of such town, to be expressed as herein provided, be and they are hereby authorized to subscribe in the name and for the benefit of such town to the capital stock of the Taychedah and Green Bay plank road company, an amount not exceeding twenty thousand dollars."

"Sec. 2. The supervisors of said towns, for the purpose of paying the stock authorized to be subscribed for by this act, are hereby authorized to borrow the necessary amount of money for which they shall issue the bonds or obligations of such towns, signed by the supervisors of the same, in amounts not less than fifty dollars, which bonds or obligations shall be made negotiable, bearing interest payable annually, at such place, and at such rate, not exceeding ten per centum per annum, as may be agreed upon, and such bonds or obligations may be made redeemable at such time as may be deemed expedient by said supervisors, or such bonds or obligations, or any part thereof, may be issued directly to said company in payment of said stock, as said supervisors and the officers of said company may agree."

"Sec. 6. That before any stock shall be subscribed by the supervisors of any of the towns aforesaid to the said plank road company under the provisions of this act, the question shall be submitted to the qualified electors residing within the limits of such town, in the manner following, to wit: On the written application to the supervisors of any such town, of ten or more qualified electors of said town, which application shall specify the amount of stock they desire said supervisors to subscribe to the capital stock of said company for the benefit of such town, it shall then be the duty of the supervisors of such town to give notice by posting up in five or more of the

most public places in such town, at least ten days before the time specified in said notice for holding said election, a written or printed notice, setting forth that on a certain day, and at a certain place therein mentioned, an election will be held in such town for the purpose of deciding whether the supervisors of the town shall subscribe, in the name and for the benefit of said town, to the capital stock of the Taycheedah and Green Bay plank road company, the amount specified in the application aforesaid, which amount shall also be specified in the notice. An election shall be held and vote taken by ballot, and said election shall be conducted in all respects as provided for holding and conducting town meetings, and each voter shall deposit his ballot with the words written or printed on the same, 'For Subscription,' or 'Against Subscription;' and if it appears that a majority of the votes given are in favor of such subscription, the same shall be made in the manner provided for in this act, but not otherwise."

" Sec. 7. The said supervisors, or one of them, shall make or cause to be made an affidavit or affidavits of the posting up of the notices required in the foregoing section of this act, which affidavit or affidavits, together with the application in writing, also specified in the foregoing section, shall be by them or him deposited in the office of the town clerk of their respective towns, and recorded in his office ; and the said affidavit or affidavits and application, or certified copies of the same, or a certified transcript of the record of the same, shall be taken and received in all courts of this state, as conclusive evidence to prove the facts set forth and contained in the same."

" Sec. 8. Any two of the supervisors of the towns aforesaid, may do or perform any act or thing which said supervisors are by this act authorized or required to perform."

Chap. 12, R. S., 1849, contains the following provisions, corresponding to those of secs. 41, 66 and 74, chap. 15, R. S., 1858 :

" SEC. 36.    The inspectors shall also draw up a statement in writing, setting forth in words at full length, the whole number of votes given for each office, the names of the persons for whom such votes were given, and the number of votes given to each person, and certify upon such statement their determination of the persons elected, which statement and certificate of determination shall be left with the town clerk and recorded in his office."

" SEC. 60.    The town clerk of each town shall have the custody of the records, books and papers of the town, when no other provision is made by law ; and he shall duly file and safely keep all certificates of oaths and other papers, required by law to be filed in his office, and record such as are by law required to be recorded therein."

" SEC. 65.    Copies of all papers, duly filed in the office of the town clerk, and transcripts from the town book of records certified by him, shall be evidence in all courts, in like manner as if the originals were produced."

This action was brought in 1858 upon the first coupon attached to a bond for $1000, alleged to have been executed by the defendant on the 20th of December, 1855. The bond (which was signed by two supervisors and countersigned by the town clerk) recites the passage of the above named act of 1854, and adds : "and whereas, in pursuance of the statute aforesaid, the legal voters of the town aforesaid, did, on the 24th day of November, A. D. 1855, vote, authorizing the supervisors of the town of Lima, as aforesaid, to subscribe to the capital stock of the Taycheedah and Green Bay Plank Road the sum of seven thousand dollars ; and whereas, on the 20th day of December, 1855, in pursuance of the determination of the legal voters as aforesaid of the town aforesaid, the said supervisors of the town, as aforesaid, did subscribe to the capital stock of the Taycheeda and Green Bay Plank Road, the sum of seven thousand dollars as aforesaid : *Now, therefore*, for the purpose of carrying out the provisions of the act of the

legislature of the state of Wisconsin, as aforesaid, and in ac-cordance with the determination of the legal voters of the town of Lima, as aforesaid, KNOW ALL MEN," &c., &c.

The answer is, in substance, that the persons whose names are subscribed to said bond and coupon were not authorized to make and issue them; that at the time when said pretended bond and coupon are alleged to have been made, said plank road had not been located through said town of Lima, or any portion thereof, nor has it ever been so located; that a majori-ty of the legal voters of said town never consented in the manner provided in said act, or otherwise, to a subscription in the name and for the benefit of said town to the capital stock of said plank road company, by the supervisors of said town; that said supervisors never made any such subscription, &c.

On the trial, after the plaintiff had introduced in evidence the coupon declared on, and rested, the defendant introduced evi-dence (against plaintiff's objection) tending to show, among other things, that there was no record in the book of records of said town, of any affidavit of the posting of notices of an election to determine whether the town should subscribe to the stock of said road (sec. 7, ch. 160, Pr. Laws of 1864, *supra*); and that no such affidavit was ever filed in the office of the town clerk; that in fact notices were posted in only two places, and that at the election held on that subject the polls were not opened until after 12 o'clock, M. The defendant offered to prove that some of the signatures to the application made to the supervisors to give notice of such election (sec. 6, *supra*) were not in the handwriting of the persons named, nor author-ized by them; and that the bond in question was never deliv-ered to any one with intent to be put into circulation, or otherwise than for safe-keeping; but the evidence was ruled out. On the question whether the two notices posted were signed by any one, the testimony was as follows: A. H. Hart, who signed the bond in question as one of the supervisors, being called as a witness for the defendant, and asked wheth-

er a paper shown him was one of the notices of the election given at that time, answered that he thought it was. On cross-examination he said that the notices were signed by him. A. D. Ballou, who countersigned said bond as town clerk, being called by the defendant, testified "that there were no names to the notice when he first saw it; he took the notice off the door of A. H. Hart's house; it was in the same condition as now; there were no names to it at the time."

The court instructed the jury as follows: That the plaintiff, on producing the coupon described in the complaint, made a *prima facie* case, and was entitled to a verdict, unless it had been rebutted; that defendant could not make out a defense by showing that there was no affidavit of posting up notices of the election mentioned in the pleadings, because the filing and recording of such an affidavit was not necessary to the validity of the bond in the hands of an innocent purchaser; that in order to rebut the legal presumption that the bond and coupon were legally issued, defendant must prove that there was no legal election held under the provisions of said act, by the electors of said town; or that if such an election was held, a majority of the votes cast were against subscribing for the stock of said company; that in order to prove that there was no legal election, defendant must prove that there was no request on the part of the required number of electors of said town, or that no such notice as was required by the act was given by the supervisors, or, if such request and notice were given, that no such election was held in pursuance thereof; that every purchaser of one of these bonds or coupons is bound to take notice whether an election was in fact held under the provisions of the act authorizing the issue of the bonds; that the statute was a public and open letter of attorney to the supervisors of the town of Lima, by which they were authorized, upon certain precedent acts on the part of the electors of the town, to issue such bonds and coupons, and all persons

taking these bonds and coupons are bound to take notice whether or not these precedent acts had been performed.

Verdict and judgment for the defendant; and the plaintiff appealed.

*B. S. Doty*, for appellant:

1. The plaintiff being a *bona fide* holder and owner of the coupon, the court erred in admitting evidence that no election was legally held. *Clark v. City of Janesville*, 10 Wis., 136; *Cornell v. Hichens*, 11 id., 353. 2. It is not necessary in a suit by the holder of the bond, or the coupon, to show that a subscription was in fact made, the bond reciting the fact. Coupons are *prima facie* evidence that the holder is also the holder of the bond, or was so when they were separated. *McCoy v. County of Washington*, 7 Am. Law Reg. (1859), 193; 10 Wis., 136.

*Jewett & Hudd*, for respondent.

*By the Court*, DIXON, C. J. I think there can be no recovery in this case against the town; and as the question is one of much general importance, I shall be pardoned, I hope, for stating my reasons at considerable length. The provisions of statute material to be considered are sections one, two, six, seven and eight of chapter 160, Private Laws of 1854, and sections forty-one, sixty-six and seventy-four of chapter 15 of the Revised Statutes. They are given at large in the foregoing report. It will be seen by these provisions, that the supervisors were authorized to issue the bonds only in case an election was called and a majority of votes were given in favor of such issue, in the manner prescribed by the act. The election and consent of the majority of the voters was a condition precedent to the right of the supervisors to execute the bonds or take any subsequent step. The manner of calling the election is specifically pointed out. It must be on written application to the supervisors of ten or more qualified electors of the town. Notices of the election must be posted up in five

or more of the most public places in the town, at least ten days before the holding thereof. The inspectors of election must draw up a statement in writing, setting forth in words at full length the whole number of votes given for subscription and against subscription, and certify upon such statement their determination ; which statement and certificate of determination must be left with the town clerk, and recorded in his office. The supervisors, or one of them, must also make or cause to be made an affidavit or affidavits of the posting up of the notices, which affidavit or affidavits, together with the written application to the supervisors, must be deposited and recorded in the office of the town clerk. Copies of the statement of votes and of the certificate of determination of the inspectors, and transcripts from the town book of records, properly certified by the town clerk, are made evidence in all courts. Like certified copies of the affidavit or affidavits and application, or a certified transcript of the record, shall be taken and received in all the courts of this state as conclusive evidence to prove the facts set forth and contained in the same. These provisions mark very clearly to my mind the intention of the legislature that all persons negotiating for the bonds, whether directly with the supervisors or with third parties, must look to the records and govern themselves accordingly. They are public records, open at all times to inspection ; or if in any case this is inconvenient or impracticable, transcripts can be procured at a very trifling expense. They are the evidence of the transactions of the town, kept and preserved as well for the benefit and protection of the citizens as of the holders of the bonds. In some respects, and those obviously most for the interest of the holders of the bonds, they are conclusive evidence. As to the vitally important facts of the notices and application, they cannot be impeached or contradicted. The importance attached to these records, the particularity with which they are required to be kept, the fact that they are public, and regulated and prescribed by the act authorizing the

subscription, as part of the means by which the power given is to be carried into execution—all go to establish the purpose of the legislature, which was, that they should be public, official notice of every thing contained in them, and that, if they are defective or wholly wanting, persons dealing with the agents of the town—for the supervisors are nothing but agents acting under a special authority—should be on their guard, and see that they do not exceed their powers.

Upon this question of the records of a town being notice to third persons dealing with its agents, I do not suppose there are many reported cases. I have found but one, *Backman v. Charlestown*, 42 N. H., 125, in which the question was directly adjudicated. The question arose upon the power of the agent of the town for the purchase and sale of spirituous liquors, to bind the town by a purchase upon credit. It was conceded that the selectmen had the power to authorize the agent to buy upon the credit of the town. In that case, however, the agent was restricted. He was directed not in any case to purchase on the credit of the town. The appointment of the agent and the instructions of the selectmen were recorded in the town book of records. As the question is one of much interest, and in some respects, perhaps, new, I quote fully from that part of the opinion. After a somewhat minute examination of the law of agency, and the distinction between general agents and special agents, the opinion proceeds as follows :

" Independent of the restriction, then, our conclusion is, that the agency was a general one, and that it was within the scope of the agent's authority to pledge the credit of the town."

" It is quite clear that in the case of a general agent, the party who deals with him is not affected by the instructions which are given to guide him in the execution of his duties, unless they are brought to his knowledge. Having the power of a general agent conferred upon him, third persons are entitled to deal with and accredit him as such, and may safely

assume that he is fully authorized to act for his principal, so long as he keeps within the general scope of his authority. If he violates his instructions, he is answerable to his principal for the injury it may cause him, but it cannot affect the validity of the contract."

"And even though the principal may be innocent of any wrong purpose, yet, having for his own convenience voluntarily placed the agent in a situation of apparent authority, it is right that he should suffer rather than innocent third persons, who have confided in the authority which the agent was thus enabled to assume. Chitty on Cont., 199, 215, and cases cited; Story's Ag., sec. 73 ; 2 Kent's Com., 620. And this principle is held to be necessary to prevent fraud and to encourage confidence in dealing."

"But it is contended that the plaintiff is to be charged with notice of the limitations upon the agent's authority contained in his appointment. If so, it is clear, upon both principle and authority, that the town would not be bound. The inquiry then, is, whether the plaintiff is to be charged with such notice. By the law of 1855 (ch. 1658, sec. 8), it is provided that every agent shall receive a certificate of his appointment, ' which shall be recorded by the clerk of the city, town or place, together with the rules prescribed for his observance.' And in section 7 of the same act it is provided that the agent 'shall, in the purchase and sale of such liquor, conform to such rules and regulations as the said mayor and aldermen or selectmen shall prescribe, not inconsistent with the provisions of this act.' "

" The effect, then, of these provisions is, that the appointing power shall prescribe rules and regulations both for the purchase and sale of liquors by the agent, and have them recorded by the town clerk. The object of this record must have been to give notice, not only of the appointment of the agent, but of the rules that were to guide him in the discharge of his duties, both in the purchase and sale of liquors. And we see

no reason to doubt the power of the selectmen to withhold from the agent the authority to pledge the credit of the town."

\*     \*     \*     \*     \*     \*     \*

"The purpose of the record, then, being to give notice to persons interested, of the appointment of the agent and the rules he is to observe, the question is, whether the plaintiff is to be charged with such notice; and we are inclined to think he is. As in the case of the registration of deeds, he is presumed to know the law which requires a record of the appointment and the rules for the observance of the agent; and reasonable diligence would have led him directly to a knowledge of the limitation in the agent's authority. Under such circumstances, there can be no ground for *contending that the instructions were secret, where a public record is required by law to be duly made. Tripe v. Marcy,* 39 N. H., 439; *Odlin v. Gove,* 41 N. H., 465, and cases cited. So it is held that a purchaser is supposed to have knowledge of the instrument under which the party with whom he contracts, as executor, or trustee, or appointee, derives his power (1 Story's Eq., sec. 400); and whatever is sufficient to put a party upon inquiry is, in equity, good notice. So in Story on Agency, section 72, it is laid down that whenever an authority purports to be derived from a written instrument, or the agent signs a contract 'by procuration,' the other party is bound to take notice that there is such an instrument, and he ought to call for it, and examine and see if it justifies the act of the agent; and this is but a reasonable precaution, for he is put upon inquiry, and if he suffers for want of such inquiry it is his own fault. So when, from the nature of the transaction, a written authority is presupposed, it is the duty of a party dealing with the agent to make inquiries as to the nature and extent of the authority. Story's Ag., sec. 73, and cases. In the case before us, a written authority is required by law, and the plaintiff is presumed to be aware of it, and is, therefore, put upon inquiry."

" Our conclusion then is, that when the appointment and limitation of the agent's authority is duly recorded, a party dealing with him must be deemed to have constructive notice of such limitation."

It was accordingly determined that the town was not liable.

It will be observed that this case is much stronger than that. For there the record was made to limit and control the action of a general agent. Here the agency of the supervisors was special and particular. They were acting under a special power. Without authority from the legislature the town could not subscribe. *Hasbrouck v. Milwaukee,* 13 Wis., 37. It is a settled principle in regard to such powers, not only that they must be strictly construed, but that municipal corporations and their officers must act strictly on the conditions under which they are given. *Striker v. Kelly,* 7 Hill, 9; *Atkins v. Kinnan,* 20 Wend., 241; *Treadwell v. Commissioners, &c.,* 11 Ohio St., 190. And this court has recently held to a very stringent rule. *Myrick v. La Crosse,* 17 Wis., 442; *Kneeland v. Milwaukee,* 18 Wis., 411. Upon an election held in the manner prescribed and a majority vote "for subscription," the supervisors were authorized to subscribe for the stock and issue the bonds, "*but not otherwise.*" Under the act, the application, affidavits of posting the notices, and statement and determination of the inspectors, duly deposited and recorded in the clerk's office, became their written authority to act for and bind the inhabitants of the town. Persons reading the act must see and know these requirements, and seeing and knowing them, must also see and know the record. In the language of the court below, the statute and the recorded action of the town in pursuance of it, showing the consent of a majority of the voters, constitute a public and open letter of attorney, of which all persons taking the bonds and coupons are bound to take notice.

In this case, beside many things which the town offered to show, but was not permitted, it was clearly proved that no no-

tice of election was given as required by the act. No affidavit or affidavits of the posting up of the notices were ever made, deposited or recorded in the office of the town clerk. At most but two notices were posted, and even those, according to the more sure and certain testimony of the witness Ballou, were not signed by the supervisors. These facts alone are sufficient to avoid the election, if indeed one was held as pretended, and to defeat a recovery upon this bond and coupon.

In putting my decision upon this ground I do not wish to be understood as holding that the validity of such bonds must in all cases depend upon the existence of the record. The record may be wanting and yet the bonds sometimes valid. They may have been ratified by the inhabitants, though no election was held, or it was defective or void. The inhabitants may be estopped by some conduct of their own amounting to bad faith in case they are allowed to repudiate. There may have been a valid election and no record made, or the record lost or destroyed. In these and like cases the town might still be bound, but the burden of proving the facts would be cast upon the holders of the bonds. But no such questions are presented here, and I mention them simply for the purpose of more clearly defining my position. What I insist upon is, that the absence of the record, and more especially of the affidavit of the posting up of the notices, is a circumstance which should have put the purchaser upon inquiry. Being bound to look to the record, and looking to it and not finding there the required evidence of this most necessary and important step, he takes the bond at his peril. He takes it at the peril of recovering nothing from the town in case it turns out upon trial that the required notices were not posted. Such is the precise condition of this case, and I think, therefore, that the plaintiff cannot recover.

Having stated my own conclusion and the reasons for it, it will naturally be expected that I should say something about those cases which hold, or seem to hold, a contrary doctrine.

The three leading and, I believe, only ones, are *Commissioners of Knox County, Indiana, v. Aspinwall et al.*, 21 Howard, 539, *Bissell et al. v. City of Jeffersönville*, 24 id., 287, and *Moran v. Commissioners of Miami County*, 2 Black, 722.    Of these cases the first and last only conflict with my views.    *Bissell et al. v. City of Jeffersonville*, is quite in harmony with them.    In that case the plaintiffs, to maintain the issue on their part, not only introduced the bonds and coupons, but the records of the city of Jeffersonville, which were full and perfect, showing a petition of three fourths of the legal voters, and the resolutions of the common council authorizing and ratifying the subscription to the stock and execution and delivery of the bonds.    The plaintiffs likewise showed that the bonds were negotiated to them for value by an agent of the railroad company, who at the same time exhibited to them duly certified copies of the record.    This fact is made prominent in the opinion, and seems to have constituted the turning point in the case.    The court observes :  " Duly certified copies of the record of the pro·ceedings were exhibited to the plaintiffs, at the time they received the bonds, showing to a demonstration that further examination upon the subject would have been useless; for, whether we look to the bonds or the recorded proceedings, there is nothing to indicate any irregularity, or even to create a suspicion that the bonds had not been issued pursuant to a lawful authority ; and we hold that the company and their as·signs, under the circumstances of this case, had a right to assume that they imported verity."    This then was doing just what I claim must be done in this case, looking to the record for evidence of the authority of the officers to execute the bonds.    So far, therefore, from the case being against my views, I think it an authority in their favor.

Again, the fact that no fraud was imputed to the mayor and council in issuing the bonds is industriously noted.    Here the answer discloses a most glaring case of fraud and recklessness on the part of the supervisors, which the town proposed to fol-

low up with proof, and which it did in part establish.   The
question in the case was, whether, as against the record and
the fact that the plaintiffs were purchasers for value of the
bonds relying on the truth of it, the city should be permitted
to go into evidence to show that it was in some respects false
or incorrect. After long delay, suffering the bonds to be thrown
upon the market and bought and sold, and many acts of ac-
quiescence, the proposition on the part of the city was to show
by parol testimony that the petition was not in fact signed by
three fourths of the legal voters.   It appeared from the record
that, upon the coming in of the petition, the common council
referred it to a committee of three of their own number to
ascertain and report the fact, and that the committee reported,
upon examination of the petition, and of the poll-book of the
last charter election, that the names of more than three fourths
of the legal voters of the city were appended to the petition.
It also appeared that the report of the committee was adopted.
The court held that the determination whether the petition
was signed by three fourths of the legal voters, was a duty
devolving upon the common council, and that it was properly
performed by the method pursued. I think there can be no
doubt of the correctness of these conclusions.  Commenting
upon this point they say :   " Fraud is not imputed in this case,
and it does not appear that it was even suggested at the trial
in the court below that the board neglected that duty at the
time the contract was confirmed ; but the defense was that the
finding was erroneous, because the petition, as matter of fact,
did not contain three fourths of the legal voters of the city."
And elsewhere in the opinion they say that " it is obvious that
the contract had been made in good faith, under the full belief
that they were duly authorized to subscribe for the stock, and
issue the bonds in the name of the city."   I need not say more
to distinguish the case, or show that it is more favorable than
otherwise to the correctness of my conclusion.

But the *Commissioners of Knox County v. Aspinwall* and *Mo-*

*ran v. Commissioners of Miami County* certainly have a strong look the other way. Still if they were binding authority in this court so that we must be governed by them, I think they are plainly distinguishable from the case now before us. It appeared in the *Aspinwall* case that there was a record fair on its face. The plaintiffs gave evidence of it, showing the order of the commissioners for the subscription "in accordance with the wishes of the voters of the county."

It appeared also that it was the duty of the commissioners to decide, in the first instance, whether there was a majority vote in favor of the subscription. In the case of *Moran* the facts are not as fully reported. We are not informed what the irregularities were upon which the county relied, or whether there was any defect or informality in the record of the pro ceedings of the commissioners. It does not appear even that an election and the assent of a majority of the voters of the county were required to enable the commissioners to act. If an election was required, it must be assumed that the commissioners were the persons authorized to determine the vote. The case before us, however, is quite different in this respect. It is not the supervisors but the inspectors of election who are to determine the vote. The supervisors may or may not constitute the board of inspectors (R. S., ch. 15, sec. 22); and if they do, they act in that capacity and not as a board of supervisors. If as supervisors they were authorized to determine the vote, there would be some plausibility, perhaps, in saying that their recitals in the bond should conclude the town ; but since they have no such authority, there seems to be no reason for hold- ing that the recitals should have that effect.

But I am not disposed to stop here. I go further, and say that I cannot assent to the broad doctrine of those cases as to the effect of such recitals. I think the error in them consists in the want of a proper discrimination between public and private corporations—corporations the records of whose pro- ceedings are open and subject at all times to the inspection of

the public, and those which are not, and where the public must trust to the acts and representations of their agents. With all due respect for a court of such great learning and ability, I must say that I think it erred in applying the doctrine of the English courts (which applied them only to corporations whose records are not public) to our municipal bodies, whose records are public.

In direct opposition to these cases are the case of *Treadwell v. Commissioners &c.*, 11 Ohio St., 191, and that of *Gould v. The Town of Sterling*, 23 N. Y. 456; S. C., 10 Am. Law Reg., 290.

Commenting upon the *Aspinwall* case, the supreme court of Ohio say : "To the mere facts of the putting the bonds in circulation, and the recital in them of the authority under which they were issued, and independent of the provision of the act hereafter to be considered, we are not prepared to give the conclusive effect which is claimed in this case. The decision of the supreme court of the United States must rest on the assumption that it was competent for the commissioners of Knox county, by some act of their own, to make their authority complete, an assumption we are not at liberty to make in this case."

"This is shown by the case on which that court relies, *Royal British Bank v. Turquand*, 6 Ell. & Black., 327—in which case it is said, that parties dealing with joint stock companies 'are bound to read the statute and the deed of settlement. But they are bound to do no more. And the party here, on reading the deed of settlement, would find, not a prohibition from borrowing, but a permission to do so on certain conditions. Finding that the authority might be made complete by a resolution, he would have a right to infer the fact of a resolution authorizing that which on the face of the document appears to be legitimately done.' The resolution referred to, the case shows to be a resolution of the company which had been informally and irregularly made. If the authority could

not have been made complete by any action of the company with which the party was dealing, but depended upon a condition required by the statute, the decision would have been different. The principle on which the case was decided is shown by the report of it when before the Queen's bench, 5 Ell. & Black., 248. It was a case of irregularity in the proceedings of a company having power to do the act, and an excess of authority on the part of its directors, which it was held should not affect a third person dealing with the company in good faith. The other case cited in the opinion of the supreme court of the United States, *Maclae v. Sutherland*, 25 Eng. L. & E., 114, is there stated to be a case of irregularity in framing a security."

"The distinction between such cases and those where an act is illegal, or there is a want of power, is manifest. In the same volume of the reports of the supreme court of the United States, a want of power on the part of the corporation was held to render invalid notes which it had executed, and it was said that 'persons dealing with the managers of a corporation must take notice of the limitations imposed upon their authority by the act of incorporation.' *Pearce v. Madison & Ind. R. R. Co.*, 21 Howard, 441–443. The principle applies with full force to a board of county commissioners, acting under a special power and in reference to a particular matter."

The opinion of Judge Selden in *Gould v. The Town of Sterling* is a most thorough and exhaustive argument of the point treated by the court of Ohio. I also call the particular attention of the profession to the very able notes of Professor Dwight appended to the case in 10 Am. Law Reg., 297. They show, it seems to me, beyond the power of contradiction, that neither the unauthorized recital of the supervisors upon the face of the bond, nor the negotiable form of the instrument, can preclude the town from showing that the conditions precedent were not in fact performed. That such recital is unauthorized there can be no doubt. There is nothing in the stat-

ute requiring or permitting it. The statute makes the record the evidence of the election having been duly held and a proper vote taken authorizing the issue of the bonds. Had the statute authorized the recital, or declared it evidence of the facts recited, the question presented would have been very different. I should not then be disposed to differ with the supreme court of the United States, where there had been a fair sale of the bonds for value. But now I must differ with them, and must hold that whether the power conditionally conferred by the statute was ever vested in the supervisors is a question open to investigation and contradiction. As to the effect of the recital, the question is very analogous to that presented upon recitals in judicial records of jurisdictional facts. This court, following the lead of others, long ago repudiated the idea that the record was conclusive because it recited the necessary facts, but held that whether it was a record or not depended upon the actual existence of those facts. *Rape v. Heaton,* 9 Wis., 335 ; *Pollard v. Wegener,* 12 Wis., 572. So here the question whether this is the bond of the town or not depends not upon the recital, but upon the fact whether a majority of the legal voters voting at an election held in the manner prescribed by the act ever gave their assent to it. It is a question of jurisdiction on the part of the supervisors. To say that the supervisors had the power to bind the town because they recited that they had, is assuming the whole issue. It is reasoning in a circle. It is like the man pulling to overcome the law of gravitation. It cannot be done. The real facts lie back of all this, and it is to them we must go to ascertain whether it is the bond of the town at all or not.

The same train of reasoning applies to the objection that the instrument is negotiable in its character, and therefore cannot be impeached. The question whether it is the bond of the town or not, must first be approached and determined. Upon this point I quote briefly from the notes of Professor Dwight above referred to. He says : " It seems entirely clear

that no representations by an agent can ever establish the fact of agency. This proposition is true without qualification, both at law and in equity. If a person who is not in fact authorized, represents that he has power to execute a promissory note for another, the instrument, so far as the supposed principal is concerned, is utterly void. The negotiability of the note will have no effect upon the question, as the inquiry turns upon the existence of the note itself. The term ' negotiability' presupposes the existence of an instrument made by a person having *capacity or power* to contract in that particular manner. Instruments made by infants, married women, insane persons, or others without capacity to make binding contracts, gain no additional validity because they may assume the form of negotiable paper. It is entirely immaterial whether the incapacity or want of power is general, or extends only to the particular act in controversy. For similar reasons, an agent can no more enlarge his powers by means of unauthorized representations than he can create them. *New York Life Insurance and Trust Co. v. Beebe*, 3 Selden, 364. The inquiry then must be confined to the question, what has the *principal said or done* which bears upon the supposed agency? If the power cannot be derived from his representations or acts, it cannot exist at all."

And so it is here. If this instrument is the bond of the town, it is because the acts of the voters have made it so. For, as was determined by this court in a similar case, *The Town of Rochester v. the Alfred Bank*, 13 Wis., 439, the voters are the principals and the supervisors the agents, having no power to act except upon the conditions specified in the statute.

For these reasons, therefore, I am of opinion that the judgment of the circuit court should be affirmed.

Judgment affirmed.

Justice COLE dissents in this case.